**FORTY FOUR O ONE HAMPTON REALTY COMPANY, Inc., Plaintiff-Respondent,**

v.

**Gregg William KEEGAN, Defendant-Appellant.**

**No. 32679.**

St. Louis Court of Appeals.

Missouri.

Feb. 20, 1968.

Motion for Rehearing or to Transfer to Supreme Court Denied March 21, 1968.

Application to Transfer Denied May 13, 1968.

Robert T. Ebert, Thomas, Busse, Weiss, Cullen & Godfrey, St. Louis, for defendant-appellant.

Robert W. Henry, Clayton, for plaintiff-respondent.

ANDERSON, Presiding Judge.

This is an action for rent alleged to be due under a lease between plaintiff and defendant. There was a verdict and judgment for plaintiff in the sum of $1,925.00. Defendant has appealed from the judgment.

The petition alleged that plaintiff was a corporation and the owner of property known as the Hampton Bank Building, 4401 Hampton Avenue in St. Louis; that on October 3, 1962, it agreed to lease to defendant Room No. 305 in said building for a term of two years to commence November 1, 1962 and end October 30, 1964, at a yearly rental of $2,100.00 payable in advance in monthly installments of $175.-00 on the first day of each month during said term.

It was further alleged that defendant moved from said premises on December 1, 1963, and had refused to pay the monthly payment due thereafter; that following defendant's removal plaintiff attempted to rent said premises but such attempts were unsuccessful. The prayer of the petition was for judgment for $1,925.00 and costs.

By his answer, plaintiff admitted that plaintiff was a corporation organized and existing under the laws of the State of Missouri, and owner of the Hampton Bank Building. Further answering, defendant denied generally each and every other allegation of the petition. No affirmative defenses were pleaded.

The evidence shows that the lease in question was executed on October 3, 1962. It was signed by John J. Gazzoli on behalf of plaintiff, and by Gregg William Keegan as lessee. Mr. Gazzoli was Vice-President of plaintiff corporation and authorized to act for it in the matter of leasing office

space in the building. The building in question was a three story structure known as the Hampton Bank Building located at 4401 Hampton Avenue in St. Louis. It was also known as a medical and professional building, with offices on the second and third floors. The part let to defendant was described in the lease as "Room #305 on the third floor of the Hampton Bank Building containing approximately 540 sq. feet." The duration of the lease, according to its terms, was for two years commencing on the first day of November, 1962 and ending on the 30th day of October 1964. It provided for a yearly rental of $2,100.00 payable in advance in equal monthly installments of $175.00 on the first day of each and every month during said term. There was a provision in the lease that failure on the part of the lessee to pay any installment of rent promptly would, at the option of the lessor, work a forfeiture of the lease but such forfeiture would not relieve the lessee from the obligation to pay said monthly payments of rent, and in event of forfeiture the lessor was empowered to relet the premises as agent for and in the name of the lessee at any amount readily obtainable, and apply the proceeds therefrom to any sum expended by the lessor in re-entering the premises and to the payment of rent as it should become due and pay the balance, if any, to the lessee. The lease further provided that in case of termination of the lease by forfeiture the lessor would deliver possession of the premises with all keys, locks and bolts. Said lease contained the following provision:

"It is stipulated and agreed between the parties to this Lease that in the event the Lessee, Gregg W. Keegan, operating as an individual should come to his demise or in the event he should become physically incapacitated and unable to perform his duties as an attorney that the Lease herein shall be terminated upon written notice furnished by Gregg W. Keegan or his representatives to the said Lessor. The notice herein given shall be sixty days."

On September 27, 1963, defendant sent to plaintiff by registered mail a notice of termination by him of the lease as of December 1, 1963. This letter was not introduced in evidence, but defendant testified that plaintiff was advised in said letter that he wanted to terminate the lease by reason of "problems concerning my health." From the evidence it may be inferred that defendant was by this letter attempting to give the 60 day notice of termination under the stipulation heretofore set out providing for termination in the event the lessee should become physically incapacitated and unable to perform his duties as an attorney.

Thereafter on October 16, 1963, Sale and Evans, counsel for plaintiff, wrote the following letter to defendant:

"We are general counsel for the Forty-Four-O-One Hampton Realty Co., Inc. Your writing of September 27th has been referred to this office for reply.

"You are hereby advised that the said writing does not constitute sufficient notice to terminate your tenancy at the above address under the terms of the lease which you entered into with our client under date of October 3, 1962.

"If it is your intention to terminate this lease under the clause relating to the physical incapacitation, your notice should so state and should be accompanied by a physician's certification to that effect."

In response to this letter defendant forwarded to plaintiff some evidence relative to his alleged disability. What its nature was is not clear from the evidence. It was not introduced into evidence. It is a fair inference from the testimony that it was forwarded to plaintiff's attorneys with a letter dated November 18, 1963. It does not appear when it was received by plaintiff's attorneys. Defendant moved from the plaintiff's premises on November 22, 1963.

On November 26, 1963, plaintiff's attorneys, Sale and Evans wrote the following letter to Mr. Keegan, addressed to him at the Hampton Bank Building:

"Reference is made to your letter of November 18th.

"In accordance therewith, the Forty-Four-O-One Hampton Realty Company, Inc. will release you from your lease as of December 1, 1963, provided your rent is paid through November, the premises are vacated and the keys surrendered on or before November 30, 1963. If you desire, these dates may be extended through December provided rent is paid for December.

"We hope that your illness will prove to be of a temporary nature and that it won't be too long before you will be able to return to work."

As heretofore stated defendant had moved from the premises prior to the time this letter was written without paying the rent due November 1, 1963. In fact the November rent was not paid until January 17, 1964. The keys were delivered to the building maintenance man at sometime not disclosed by the evidence.

On January 15, 1964, plaintiff's attorneys, Sale and Evans wrote defendant the following letter:

"Further reference is made to your letter of November 18th and our reply of November 22, 1963. The release of your obligation under your lease is conditioned upon the payment of the rent for the last month of your tenancy. To date, payment has not been received by our client, Forty-Four-O-One, Inc.

"Unless we receive your check in the amount of $175.00 within the next few days, it will be necessary for us to institute legal proceedings."

All the foregoing correspondence was addressed to defendant at the Hampton Bank Building. The rent due December 1 was never paid.

Plaintiff's president, Mr. Gazzoli, testified that the agreement to terminate the lease was subject to defendant being actually incapacitated; that sometime thereafter, as a result of information received he began to investigate the matter; that he then learned defendant had moved to another office the same day he left plaintiff's building, his phone was moved and cards were printed announcing defendant's removal to the new office. Mr. Gazzoli further testified that he went to the new location and saw a sign on the outside of defendant's office which read "Gregg Keegan, attorney at law". He then employed Mr. Henry. He further stated that he employed Sale and Evans for the purpose of securing an interpretation of the lease and proof of Mr. Keegan's disability. There was no direct evidence by either party that Sale and Evans were given express authority by plaintiff to surrender any substantial right of plaintiff.

Defendant moved directly from defendant's premises to a building owned by Stuckenberg Realty Company located at 6512 Chippewa. The rent for the office space at the new location was $75.00 per month. The records of the telephone company show that defendant's telephone number was changed to the new address at 6512 Chippewa effective as of November 26, 1963. Defendant's secretary prepared a notice on a post card which was mailed to defendant's clients. It announced the removal of defendant's office from the Hampton Bank Building to 6512 Chippewa, and stated that defendant's telephone number was the same, Vernon 2–3800.

Defendant testified that for the last twelve years most of his practice had been the trial of lawsuits for individuals in both the State and Federal Courts; that at the time the lease was executed he was working and trying cases, but that between October 1962 and May 1963 he had help in his practice from other lawyers.

Defendant's difficulty with his health required medical attention beginning August 28, 1962. On that date he consulted Dr.

Francis Bandle who was a medical doctor specializing in neuropsychiatry. Defendant testified that in May, 1963, his condition got so bad he had difficulty in talking; that he wanted to withdraw and get away from people. He stated, " * * * I wanted * * * to pull a great sheet over my head, or something like that. I don't know what it was. * * * I continued on going to the doctor, * * *. * * * he was advising me at that time, just trying to work under the handicaps that were present. And this was not helping the situation, and he pulled me of work entirely." Defendant further testified he stopped going to his office in May 1963; that he may have been back at sometime, but that he was in a condition where he could not have any "sustained period with people." He stated he did not try any cases between May 1963 and December 1963, or appear in any court to argue motions or present matters of any type; that during this period he maintained his office with his secretary and that other attorneys came there to assist with matters, such as taking depositions, pleadings and motions.

Defendant further testified that his condition got so bad he did not want to leave his house; that he would call his office on the telephone and transact business through his secretary because he had difficulty dealing with people; that he authorized attorneys in his office to prepare court papers in his name for which service they were paid; that when he returned to active practice he tried his first case to completion in January 1966; that he thought the last case he tried to completion before that was prior to May 1963; that his secretary, Mrs. Heritz held a power of attorney to write all checks, deal with his bank accounts, sign his name and "handle everything," that she paid her own salary and paid the other lawyers; that "she ran the show."

On cross-examination, defendant testified that Steve Gilmore, a lawyer, was employed by him on a full time basis prior to the execution of the lease with plaintiff;

that thereafter the situation got worse; that he could not go into court or talk to clients; that he never had quit; that he fought it all the way and was still fighting it, but "by large and far, I just wasn't performing"; and that he tried to hang onto his practice.

Defendant gave the following testimony:

"Q. * * * As a matter of fact, in May, of 1963, you were still getting business, personal injury cases, isn't that a fact? A. I have continued to get business all my life. * * * Q. We are talking about the period of this lease, from October, of 1962 until November, of 1963, when you left. A. I had a number of different attorneys go out and obtain cases for me."

Defendant further testified that the case of Bitter v. Mound City Yellow Cab Company was sent to him. It concerned an accident which occurred in May 1963. His name appears on the petition as attorney for plaintiff. The suit was filed October 17, 1963 and was still pending. Defendant stated that his secretary signed his name to the petition with his authorization. An amended petition was filed in the case in April, 1964.

Defendant further testified:

"Q. Now, Mr. Keegan, following November 1963, when you moved out of the Hampton Bank Building, you continued to file lawsuits, did you not, right along, in both the city and the county circuit courts on behalf of people in damage suits, as you have talked about? A. I am not denying that the suits were filed."

Defendant was shown a petition in a lawsuit filed in the Circuit Court January 10th, 1964, with his name appearing thereon as attorney for plaintiff. He stated his name was signed to the petition by his secretary.

The record also shows that a petition was filed January 15, 1964 in the Circuit Court

of the City of St. Louis signed by Mr. Keegan as attorney for plaintiff.

Defendant further testified on cross-examination:

"Q. Now, you were earning money as a practicing lawyer during the year 1964, were you not? A. Every year since I've been in the practice of law, I have earned money. Q. So that you have had income from practicing law in 1963, 1964, and 1965, and so on, is that correct? A. My income dropped appreciably when I was sick. Q. The question was, you did have income, did you not? A. You mean, I assume, a dollar or more,—yes."

Defendant admitted that in May 1964, the court awarded to him a fee of $2500 in the case of Bitter v. Mound City Yellow Cab Company, which was a minor's case. He stated however that he did not know how much of the fee he received—that it was handled by someone else.

Defendant denied he was practicing law in January 1964. He said: "I was sick. I came out of Renard Hospital * * * around the first part of December, and Dr. Shobe had me go in the office a certain amount of time every day. But if you say I was practicing law, I wasn't practicing law. I was actually practicing how to walk again." When asked about the petitions filed in his name, defendant replied, "They are my law practice, carried out with the aid and help of a lot of people that I know very well. * * * I wasn't doing the job."

Defendant also gave the following testimony:

"Q. Wasn't the only reason you changed your offices from the Hampton Bank Building to 6512 Chippewa, because the rent was less? A. No. It was a serious question as to whether I was ever going to get on my feet again. I was supposed to go to Baltimore for six months for treatment, that type of thing. There was some question as to whether I would ever go back to work. Q. Was there some reason why you didn't close your office rather than move it? A. I couldn't close my office. I wasn't going to turn my back on people who were working for me, people who were helping me. Q. Was there any reason you couldn't continue to operate in the Hampton Bank Building as easy as in the 6512 Chippewa Building? A. There were a number of reasons. I was having panic reactions. I had to get out. I had this feeling that I had to get out of wherever I was immediately, and you can't do that when you are on the third floor."

On redirect examination, defendant testified that in the minor's case referred to on cross-examination the file showed that Mr. Gioia's name appeared on the court memorandum as attorney for plaintiff in said suit; that Mr. Gioia helped him while he was sick and he paid Mr. Gioia; that the other lawyers who helped were Joseph McGlynn, Jr., Vince Hartigan, Jack Bardgett, James Godfrey, James Rankin, Morton Lange, and Jerry Slater; and that he paid them for their services.

Dr. Bandle testified that defendant first came to his office on August 28, 1962. He stated: "* * * he was suffering from a great number of physical complaints based upon emotional problems. He had a great deal of what we call phobic reaction. He was fearful of many things. * * * I treated him as an office patient." The doctor further testified that the treatment administered between August, 1962 to May, 1963 was psychotherapy and drug therapy to alleviate the anxiety and phobic reactions he was suffering from; that in May of 1963, because of lack of progress, he advised defendant that he should think of leaving the city, and not try to practice law for a period of time to see if putting him out of the whole environment might help; that on June 17 he told defendant he had to get away from business completely until the first of September, and even suggested that he might shut down his office; on September 3rd he told defendant he should stay out of the city for two more weeks; at

that time defendant was phobic, anxious, and had somatic symptoms of air hunger and panic reactions; that in a panic reaction the anxiety becomes so great the patient loses his ability to judge things correctly, and the psycho-motor activity becomes usually quite agitated; that he could not honestly say that in September, 1963, defendant had panic reactions, but did sometime between May 1963 and September 1963; that air hunger is a term used when people become very agitated; that in air hunger they feel they cannot get enough oxygen and they hyperventilate, which causes them to feel light headed and may actually cause the person to faint; that he saw this happen to Mr. Keegan in his office, but he did not know if it occurred during the period from May 1963 to September 1963; and that during the whole period he was treating defendant he administered psychotherapy which was an attempt to help the patient understand his problems.

Dr. Bandle then gave the following testimony:

"Q. Doctor, at that time, in September, 1963, do you have an opinion, based upon reasonable medical certainty, whether or not Mr. Keegan was physically incapacitated to perform the duties and functions of an attorney at law under the way that he had performed them in the past, in other words, insofar as being a trial attorney? A. Yes, I have expressed that opinion to his insurance company. Q. What is your opinion as to whether or not he was physically incapable or not in the period September 1, 1963, around that time? A. At that time I made a statement that he was totally disabled."

Dr. Bandle further testified he continued to see defendant after September 1, 1963; that from that time until he went to the Enoch Shepherd Pratt Hospital in 1964, he was totally disabled from performing his practice as a trial lawyer; that he suggested to defendant in May 1964 that he go to the

hospital, but he did not go there until September 1964; that he remained at the hospital four days, and returned because his phobic reaction about leaving his home was so great that he could not remain there; that the Shepherd Pratt Hospital is a psychiatric hospital in Baltimore, Maryland; that that was the last time he saw defendant because Mr. Keegan was to go to Renard Hospital, and since he was not on the staff there, he transferred the case to Dr. Shobe; and that defendant was at that time still incapacitated to try cases and practice law the way he had prior to his illness.

Dr. Frank O. Shobe was called as a witness by defendant. He testified he was a physician specializing in psychiatry; that he first saw Mr. Keegan in his office in July, 1964; that defendant gave a history of being quite depressed for a period of several years and unable to practice law because of a panic reaction, a term used for a highly nervous condition which prevented him from going into the court room; that he did not make a physical examination of defendant at the time; that a physical examination is not done by a psychiatrist during the first or second interviews because most of their patients are referred by internists who have previously made the physical examination and necessary laboratory examinations, which was the case with Mr. Keegan; that he saw Mr. Keegan twice in July, of 1964, then three or four times during the first two weeks in September, 1964, after defendant had returned from the Enoch Shepherd Pratt Psychiatric Hospital in Maryland.

Dr. Shobe further testified: " * * * I had formed an opinion as to what I thought was the best procedure to try and help him, in July, of 1964, and I had recommended at that time that he either go into a hospital here in St. Louis or to a hospital out of town, and I selected one in Baltimore for this particular case for purely technical reasons. * * * This hospital is designed to take care of the type of illness Mr. Keegan was suffering from. And again,

when he had returned from Maryland, and I saw him the early part of September, 1964, I again recommended to him that he come into the hospital. * * * He was in Renard Hospital from September 14, 1964 until October 30, 1964."

He further testified that while in the hospital defendant's treatment consisted of drug therapy and psychotherapy; that defendant was better when he left the hospital; that he saw defendant two weeks prior to the trial, (March 25, 1966) and his condition was very good at that time; that in his opinion defendant could go back and try cases.

Dr. Shobe gave the following testimony over plaintiff's objection that the doctor had not been shown to have sufficient knowledge of the practice of law to give opinion testimony with reference to defendant's ability to perform his duties as an attorney:

"Q. Doctor, I will ask you, based on the history you obtained from the patient, and based upon your consultations with him in the period July, 1964 and subsequent thereto, whether or not you have an opinion, based upon reasonable medical certainty, whether or not he was physically incapacitated and unable to perform his duties as an attorney at that time? * * * A. Yes. He was totally disabled. * * * Until about October, the middle of October, 1964. While he was still at Renard Hospital, I started him going back to his office for an hour a day in the early afternoon after lunch, for example, * * * and he would go back during the first week, as I recall, for an hour a day; and the second week I had him go back for two hours a day. I then discharged him from the hospital, as I said, and it was about three or four months before he was able to go to the office and stay for a period of three or four hours a day. * * * I think, as I recall, he went back to his office full time duty in about the middle of 1965."

On cross-examination, Dr. Shobe testified he knew defendant maintained an office; that Mr. Keegan told him he had a secretary there, who was taking care of some of the legal matters still pending, apparently when he became ill; that he did not know whether Mr. Keegan obtained any new cases from the first time he saw him in July, 1964 to October, 1964; that he did not know whether Mr. Keegan filed any lawsuits during that period; that he would not have an opinion as to whether filing a lawsuit would be practicing law; that he had not seen Mr. Keegan prior to July, 1964; and that from his history Mr. Keegan's problems related as far back as 1958.

Anna Louise Heritz was employed as secretary by Mr. Keegan continuously from 1948 to the time of the trial below. She testified that when the office was moved to the Hampton Bank Building, Mr. Keegan was coming to the office; that from October 1962 to December or January 1963 he would come to the office about three or four times a week; that from January 1963 to May 1963 he would come to the office, but not as frequently as he had previously; that during that time he would maybe come to the office three days a week; that during said time he saw people, dictated letters and prepared suit papers; that she had no recollection of him trying any cases during the period from January to May, 1963; that other attorneys were doing his trial work during that period; that those attorneys were, Joseph McGlynn, Anthony Gioia, Edward Filippine, Carl Gaertner, James Rankin, James Godfrey and R. J. Slater; that these attorneys were paid; that from January 1963 to May 1963 depositions were taken, but not by Mr. Keegan; that the depositions were taken by one of the attorneys she had theretofore mentioned for which they were paid as soon as the deposition was taken; that during the period from May, 1963 to September, 1963, Mr. Keegan came to the office very rarely, maybe on the average of one day a week at the most; that during that time she took care of routine matters, ordering police reports,

pictures and things of that nature; that as to court papers that had to be filed she would contact the attorney handling the matter who would come in and look over the file; and she would prepare various pleadings at his direction; that she would type Mr. Keegan's name on the pleadings, and in some instances sign Mr. Keegan's name; that in some instances the other attorneys would sign Mr. Keegan's name to the pleadings, and in some instances their name appeared as co-attorney; that Mr. Keegan was not in his office during the period between September 1, 1963 and December 1963, being unable to leave his house; that he was physically disabled so that she was unable to talk to him about any problem or plan in connection with his practice, but had to consult the other attorneys.

Mrs. Heritz testified she prepared the notice of termination of the lease; that Mr. Keegan asked her to prepare the notice in view of his inability to do his work; and that the office was moved on November 22, 1963 to 6512 Chippewa.

Mrs. Heritz further testified: "Well, Mr. Keegan had indicated to me that he was going to have to go away for a period of time because of his health, and that he could no longer maintain the Hampton Bank Building office since he wasn't able to practice, and I wanted to get some place so that the clients would know where we were, and in fairness to them, he wanted to maintain his name at some location. So he had previously, as he told you before, talked to Mr. Diehl about the location at 6512 Chippewa, and so we made arrangements to move."

It further appears from Mrs. Heritz' testimony that she made all the necessary arrangements for moving, had the telephone number changed to the new location, and prepared and mailed the card notifying clients of the change of address. She also stated she talked to Mr. Keegan to the extent only of advising him what she had done. She was shown petitions in suits filed and stated she signed Mr. Keegan's name to them after they were prepared by the attorneys who were helping Mr. Keegan with his law business. She further testified that Mr. Keegan started coming into the office the latter part of 1964 at the recommendation of his doctor, for maybe an hour each day in the beginning; that he would just sit there and not talk to anybody, or take testimony; that she was instructed to give him a file for him to look over and that after a while he increased the time to two hours and then to three. The witness further testified: "He's pretty well back to work now. * * * He has just recently started back to work. As far as the trial of cases, he tried his first case in January of this year." She further testified that Mr. Keegan did not try any cases in 1964 or 1965, that she knew of.

On cross-examination, Mrs. Heritz testified that in 1958, Mr. Keegan had some problems, and from 1958 to 1962 his work was carried on very much as it was later; that she typed petitions and things of that nature with the assistance of other attorneys; that other attorneys were helping, six or seven of them, when the office was moved into the Hampton Bank Building. It further appears from Mrs. Heritz' testimony that Mr. Keegan received fees for the work on cases handled for him by other attorneys which practice had been going on since 1958; that when the office was moved to the Chippewa location Mr. Keegan talked to Mr. Diehl; that the office was maintained at 6512 Chippewa so that clients could know where they were; that business was not maintained there to any great extent; that there were possibly some persons who, not being able to reach Mr. Keegan personally, would not turn the cases over to them; that the telephone was moved at the same time the office was moved, so that there was no reason why clients could not reach Mr. Keegan except he was not in the office at that time; that Mr. Gioia had a key to the office and would come in, go over the files and prepare pleadings; that during 1964 there was minimal income;

that she did not keep the books and records with reference to Mr. Keegan's income, but wrote checks and signed her name to them; that they moved some of the work to 6512 Chippewa that they had prior thereto; that she filed two lawsuits in January at the direction of the lawyers who were helping Mr. Keegan; that these lawsuits were Mr. Keegan's, and he would get the money out of them if they were disposed of; that Mr. Gioia prepared the original petition in the case of Bitter v. Mound City Yellow Cab Company, and she handled the signing of it; that she took a statement in the case; that Mr. Keegan was at that time conducting business during May of 1963 inasmuch as she was there, and with the help of other attorneys; that during 1964 Mr. Keegan settled very little litigation; that the doctor thought complete cessation of work was the only treatment that would help him; that he .had the problem that if he was able to return to work he could not go onto the third floor; that at the time he was seeing Dr. Bandle he had some ideas about not getting into elevators or going up stairs.

The Court, at plaintiff's request, gave Instruction No. 3, which reads as follows:

"Your verdict must be for the plaintiff if you believe:

"First, that plaintiff and defendant entered into a commercial lease wherein defendant agreed to pay $175.00 per month for a period of two years dating from November 1, 1962 to October 30, 1964, for the premises mentioned in evidence.

"Second, that defendant moved from said premises and has paid no monthly payments since December 1, 1963.

"Third, that defendant was not physically incapacitated and unable to perform his duties as an attorney, and further, that defendant's moving from said premises and failure to pay monthly rental after December 1, 1963 was a

breach of lease on the part of defendant, and

"Fourth, as a direct result of such breach of lease the plaintiff sustained damage."

Defendant contends that the instruction is erroneous because it did not submit the issue of cancellation by mutual agreement of the parties.

The point urged is without merit. Cancellation was not made an issue in the case by the pleadings or otherwise. Defendant's answer pled only a general denial to the allegations of plaintiff's petition. Under Civil Rule 55.10, V.A.M.R. matters constituting an avoidance of a contract such as cancellation by mutual consent must be affirmatively pleaded. Defendant not only was content to try the case without such pleading, but actually joined in submitting the issue as presented by plaintiff's instruction. The Court gave at defendant's request the following instruction: "Your verdict must be for defendant if you believe that defendant was physically incapacitated and unable to perform his duties as an attorney from December 1, 1963 to October 30, 1964." This was the only instruction requested by defendant. The alleged physical incapacity of defendant was the only real contested issue submitted. The court did not err in the respects claimed.

The next point urged is that the Court erred in denying defendant's motion for a directed verdict. It seems to be defendant's contention that because he was not able for a time to do trial work and personally perform certain other duties of his profession he was physically incapacitated within the meaning of the disability clause of the lease.

The motion for a directed verdict filed by defendant does not preserve this point for review. Therefore it is not be-

fore this Court for consideration. There was ample evidence to support the issue actually submitted by plaintiff's instruction, as appears from our statement of the facts developed by the evidence.

■ Defendant's next point is that the court erred in submitting the case to the jury for the reason that plaintiff is estopped from claiming a wrongful breach of the lease, having agreed to a cancellation thereof. We must rule this point against defendant for the reason that an affirmative defense of cancellation and estoppel was not pleaded. See Civil Rule 55.10 V.A.M.R.

In the course of the argument, Mr. Ebert, representing defendant said:

"Now, I submit, Ladies and Gentlemen, the check was sent to them; they accepted the check; they deposited it. That constituted, in my opinion, that there was an agreement between these two parties that this lease was then and there terminated.

"Mr. Henry: Your honor, I object to that last statement of counsel. There hasn't been any pleading of a release of any kind in this lawsuit.

"The Court: The objection is sustained. The jury is instructed to disregard the last statement of counsel as not being an issue in the case, not having been pleaded. Proceed."

■ In his points relied on in this Court defendant complains of the above ruling contending that cancellation of the lease by agreement was an issue for the jury. This alleged issue was not pleaded nor was it submitted to the jury. Furthermore, the point now urged was not preserved for review in defendant's motion for new trial.

The judgment of the trial court is affirmed.

RUDDY and WOLFE, JJ., concur.