CHRYSLER CREDIT CORPORATION,
Plaintiff-Respondent,

v.

FRIENDLY FORD, INC.,
Defendant-Appellant.

No. 9740.

Missouri Court of Appeals,
Springfield District.

Feb. 10, 1976.

Motion for Rehearing or Transfer to Supreme Court Denied March 1, 1976.

David W. Bernhardt, Thomas J. O'Neal, Bussell, Hough, Bernhardt, Leighton & O'Neal, Springfield, for plaintiff-respondent.

John R. Lewis, Bruce K. Kirby, Kirby, Lewis & Cohick, Springfield, for defendant-appellant.

Before BILLINGS, C. J., and TITUS and FLANIGAN, JJ.

BILLINGS, Chief Judge.

Respondent Chrysler Credit Corporation had judgment in this court-tried case against appellant Friendly Ford, Inc. for the balance due on a retail installment contract. The contract had been assigned by Friendly Ford to Chrysler Credit with full recourse, and Friendly Ford had unconditionally guaranteed payment of any unpaid indebtedness under the contract. The lower court also allowed Chrysler Credit attorney fees as provided by the contract and ruled in its favor on Friendly Ford's counterclaim for damages. We affirm.

Chrysler Credit maintained a branch office in Springfield, and Friendly Ford sold automobiles and trucks in that city. For some time prior to the sale giving rise to the subject installment contract, Chrysler Credit had financed installment sales by Friendly Ford.

Friendly Ford sold a 1968 Ford diesel tractor to William Richardson under a retail installment contract dated March 29, 1968. The contract was assigned to Chrysler Credit by Friendly Ford on the same date. A policy of insurance covering the vehicle against physical damage had been issued the previous day, March 28, 1968. Richardson was the named insured, and Chrysler Credit was shown as lien holder and loss payee. The policy was for the period of March 28, 1968, to March 28, 1969, and both Chrysler Credit and Friendly Ford were notified of the insurance coverage. The certificate of insurance was subsequently forwarded to Chrysler Credit by the insurance company.

On April 9, 1969, Chrysler Credit received an endorsement of a policy issued by a second insurance company insuring the vehicle against loss or casualty. Richardson was described as owner of the tractor, and Chrysler Credit was shown as the loss payee. This second policy was for the period of July 1, 1968 to July 1, 1969. Friendly Ford was not notified of the issuance of the second policy.

On December 17, 1969, Richardson executed an extension agreement to Chrysler Credit whereby, for an additional charge, his monthly payments due under the contract were postponed until March, 1970. This transaction was approved by Friendly Ford.

The Ford tractor, uninsured, was damaged beyond repair in June, 1970. Richardson was then current in his monthly payments but thereafter discontinued payments. Chrysler Credit notified Friendly Ford of Richardson's nonpayment and demanded payment of the balance owing under the contract. Friendly Ford obtained possession of the damaged tractor and by consent of the parties to this suit sold it for salvage; the amount received was applied on the indebtedness. Friendly Ford refused to pay the balance of the contract, and this suit followed.

The installment contract provided Richardson was to insure the vehicle against loss or damage during the life of the contract. In paragraph 3 of the "Additional Terms and Conditions" of the contract, the failure of Richardson to procure or maintain the requisite insurance was one of several enumerated occurrences that constituted a default under the contract and authorized foreclosure. In addition, paragraph 7 provided:

"Buyer agrees to keep the mortgaged property insured at his own expense against substantial risk of damage, destruction, or loss for so long as any amount remains unpaid on the contract, with loss payable to the Seller as its interest may appear and that he will deliver all such insurance policies upon receipt of same to Chrysler Credit Corporation. . . . *Seller may, but shall not be required to, and without prejudice to Seller's rights under this mortgage if it does not, procure such vehicle insurance* protecting: (a) interest of Buyer and Seller or (b) interest of Seller only, if Buyer fails to procure or maintain such vehicle insurance or fails to furnish satisfactory evidence thereof upon request. . . ." (emphasis added)

The assignment portion of the contract provided in part as follows: "For value received, the undersigned does hereby sell, assign and transfer to Chrysler Credit Corporation (hereinafter called 'Chrysler') his, its or their entire right, title and interest in and to the within contract and the property covered thereby, and authorizes Chrysler to do every act and thing necessary to collect and discharge obligations arising out of or incident to said contract and assignment. . . . In addition, this assignment is subject to the provisions set out below in the paragraph initialed by undersigned. *Liability of undersigned arising out of or incident to this assignment shall not be affected by any indulgence, compromise, settlement, extension, or variation, of terms of the within contract effected with or by the discharge or release of the obligation of Buyer or any other person interested, by operation of law or otherwise. Undersigned waives notice of acceptance of this assignment and notices of non-payment and non-performance of this contract.*" (emphasis added)

Immediately following the foregoing was the form of recourse agreed to by the parties and it is here set forth:

"FULL RECOURSE: The undersigned unconditionally guarantees payment of the full amount remaining unpaid under said contract, and agrees to purchase said contract from Chrysler, upon demand, for the full amount then unpaid whether said contract shall then be, or not be, in default."

By way of defense and in support of its counterclaim for expenses, Friendly Ford set forth the first sentence of paragraph 7, supra, and then alleged: "That from the date of the alleged assignment by defendant to plaintiff, William D. Richardson, the person obligated on the contract alleged to have been assigned, did have a policy of insurance protecting the lien holder against property damage and did apparently maintain said policy of insurance for a period of time after the date of the alleged assignment; that, thereafter, the policy of insurance insuring the property on which the indebtedness is owed to be lapsed and was not renewed by the owner of the property or the plaintiff lien holder to where on the date of the loss of the property there was no insurance existing on the property covered by the Retail Installment Contract alleged to have been assigned by Defendant to Plaintiff; that because of Plaintiff's failure to maintain the contract in question between itself as the lien holder and as the alleged assignee of said contract, Plaintiff should be estopped from recovering any damage in any amount of money from the defendant under the terms of its Petition."

At trial Chrysler Credit submitted its case on stipulations and exhibits including the Richardson retail installment contract, and Friendly Ford offered testimony only on the issue of its claimed defense of estoppel. The trial court made and entered findings of fact and conclusions of law and rendered judgment in favor of Chrysler Credit on its claim and against Friendly Ford on its counterclaim.

■ Three elements must be clearly established by a party seeking to assert an equitable estoppel: (1) an admission, statement or act inconsistent with a claim afterwards asserted or sued upon; (2) action by the other party in reliance on such admission, statement or act; and, (3) injury to such other party if the first party is allowed to contradict or repudiate such admission, statement or act. *Peerless Supply Co. v. Industrial Plumbing and Heating Co.*, 460 S.W.2d 651 (Mo.1970); *Owens v. Estate of Saville*, 409 S.W.2d 660 (Mo.1966); *Rodgers v. Seidlitz Paint and Varnish Co.*, 404 S.W.2d 191 (Mo.1966); 31 C.J.S. Estoppel § 67 (1964).

■ Silence or inaction may be sufficient conduct to estop a party from asserting an inconsistent claim. However, "[T]he rule is equally clear that mere innocent silence or inaction will not work an estoppel. . . . there must be a right and an opportunity to speak and, in addition, an obligation or duty to do so." 28 Am.Jur.2d Estoppel & Waiver § 53 at 667–68 (1966). And, the estopped party's silence or inaction must be the result of culpable negligence or "done with the intention, or, at least, with the expecta-

tion, that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon." *Mills v. Taylor*, 270 S.W.2d 724, 729 (Mo.1954); *Rodgers v. Seidlitz Paint & Varnish Co.*, 404 S.W.2d 191, 195–96 (Mo.1966); 31 C.J.S. Estoppel §§ 59, 69, 87, 102 (1964); 28 Am.Jur.2d Estoppel & Waiver §§ 41, 53, 61 (1966).

■ Each of the elements of estoppel was considered by the trial judge who concluded the contract placed no duty on Chrysler Credit to insure the vehicle and there was no estoppel. We agree.

The retail installment contract gave Friendly Ford, or its assignee, the authority to procure insurance at Richardson's expense "if Buyer fails to procure or maintain such vehicle insurance or fails to furnish satisfactory evidence thereof upon request." However, the *duty* to maintain insurance remained on Richardson, and the contract specifically provides Friendly Ford or its assignee "shall *not be required to*" exercise its power to acquire insurance if Richardson failed to do so. The option to acquire insurance was assigned to Chrysler Credit, together with the rest of Friendly Ford's rights under the contract.

In its assignment Friendly Ford expressly agreed its liability to Chrysler Credit, "arising out of or incident to [the] assignment shall not be affected by any indulgence, compromise, settlement, extension, or variation, of terms of the within contract effected with or by the discharge or release of the obligation of Buyer or any other person interested, by operation of law `or otherwise" and specifically waived "notices of non-performance of the contract." By the full recourse provision of the assignment, Friendly Ford unconditionally guaranteed payment of any remaining indebtedness under the contract and agreed to repurchase the contract upon demand from Chrysler

Credit "whether said contract shall then be, or not be, in default."

Friendly Ford contends that since Chrysler Credit made efforts to monitor policies on financed vehicles and had the right under the contract to purchase insurance at Richardson's expense, the loss occasioned by lack of insurance should fall on Chrysler Credit. This contention would convert the option to insure into an absolute duty, contrary to the plain and unequivocal language found in the contract and agreed to by Friendly Ford.

The record is completely silent as to the reason for no insurance coverage at the time of the loss. We do not know if the policy lapsed for nonpayment of premium or if it was canceled by the insurer for any number of reasons. The fact of the matter is that there is no evidence of notice to Chrysler Credit that coverage had lapsed or was terminated. There is no evidence Chrysler Credit misled Friendly Ford, and the latter had equal opportunity to learn the fact of noninsurance. If Chrysler Credit can be faulted for its failure to learn the vehicle was not insured, Friendly Ford can be equally faulted. There is some indication in the record Friendly Ford was aware that on previous occasions Chrysler Credit had not exercised the option to insure, resulting in no coverage on financed vehicles. In spite of its liability under the assignment, Friendly Ford made no inquiry or effort to determine whether the Richardson truck was insured. In such circumstances, estoppel cannot be successfully asserted. 31 C.J.S. Estoppel §§ 71, 87, 102 (1964); 28 Am.Jur.2d Estoppel & Waiver §§ 35, 80 (1966).

■■ In this appeal Friendly Ford, for the first time, seeks to invoke § 400.3–606, RSMo 1969,[1] and says Chrysler Credit's failure to exercise the option to insure constitutes an unjustifiable impairment of collateral. This affirmative defense was not

---

1. Section 400.3–606, RSMo 1969, provides in part:

   "(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

   \* \* \* \* \* \*

   (b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse."

pled by Friendly Ford or submitted below. It cannot now be raised. Rule 55.08; *Semo Grain Co. v. Oliver Farms, Inc.,* 530 S.W.2d 256 (Mo.App.1975); *Forty Four O One Hampton Realty Co. v. Keegan,* 426 S.W.2d 701 (Mo.App.1968). Furthermore, we entertain doubt that the instant retail installment contract is a negotiable instrument as defined by the Uniform Commercial Code [§ 400.3–104, RSMo 1969] because of the numerous promises made and powers granted by Richardson.[2] Consequently, the discharge provisions of § 400.3–606 would not be available to Friendly Ford. Additionally, § 400.3–606 recognizes *consent* may bar such a defense, and Friendly Ford's argument ignores the broad consensual language of its assignment to Chrysler Credit. As assignor, Friendly Ford consented that

its liability to Chrysler Credit would not be altered by any "indulgence, compromise, settlement, extension, or variation of" the contract or "by the discharge or release of [Richardson] or any other person interested" and Chrysler Credit was relieved of any duty to notify Friendly Ford of Richardson's nonperformance of the contract.

The same result would follow if Friendly Ford had sought discharge under § 400.9–207,[3] RSMo 1969, or under the principles of general suretyship law.[4] The sweeping assignment clause negates Friendly Ford's claim of release from the full recourse provisions.[5]

We are not unaware of at least three cases which have implied a duty on a secured creditor such as Chrysler Credit to

---

2. Section 400.3–104, RSMo 1969, requires that a negotiable instrument within Article 3 (§ 400.3–101 et seq., RSMo 1969) must "contain an unconditional promise or order to pay a sum certain in money *and no* other promise, order, obligation or power given by the maker or drawer except as authorized by this article." (emphasis added)

   Retail installment sales contracts are usually not negotiable instruments because they contain additional promises by the maker "and thus fail the 'no other promise' test." J. White and R. Summers, Handbook of the Law Under the Uniform Commercial Code §§ 13–2, 14–4 (1972).

3. Section 400.9–207, RSMo 1969, provides in part:

   "(1) A secured party must use reasonable care in the custody and preservation of collateral in his possession. In the case of an instrument or chattel paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed.

   (2) Unless otherwise agreed, when collateral is in the secured party's possession

   (a) reasonable expenses (including the cost of any insurance and payment of taxes or other charges) incurred in the custody, preservation, use or operation of the collateral are chargeable to the debtor and are secured by the collateral;

   (b) the risk of accidental loss or damage is on the debtor to the extent of any deficiency in any effective insurance coverage;

   \*   \*   \*   \*   \*   \*

   (3) A secured party is liable for any loss caused by his failure to meet any obligation imposed by the preceding subsections but does not lose his security interest."

4. Restatement of Security § 132 (1941) states:

   "Where the creditor has security from the principal and knows of the surety's obligation, the surety's obligation is reduced pro tanto if the creditor

   (a) surrenders or releases the security, or

   (b) wilfully or negligently harms it, or

   (c) fails to take reasonable action to preserve its value at a time when the surety does not have an opportunity to take such action."

5. Examples of pre-code cases recognizing that a surety or guarantor may consent to release or impairment of collateral include *Joe Heaston Tractor & Implement Co. v. Securities Acceptance Corp.,* 243 F.2d 196 (10th Cir. 1957); *Barrett v. Shanks,* 382 Ill. 434, 47 N.E.2d 481 (1943); and *Merchants Nat'l Bank v. Stone,* 5 N.E.2d 430 (Mass.1936).

   Cases decided under the code which recognize the validity of the surety's consent to release or impairment of collateral include: *Liberty Nat'l Bank & Trust Co. of Savannah v. Interstate Motel Developers, Inc.,* 346 F.Supp. 888 (S.D.Ga.1972); *Nation Wide, Inc. v. Scullin,* 256 F.Supp. 929 (D.N.J.1966); *Etelson v. Suburban Trust Co.,* 263 Md. 376, 283 A.2d 408 (1971); *American Bank of Commerce v. Covolo,* 88 N.M. 405, 540 P.2d 1294 (1975); *see also Midway Nat'l Bank v. Gustafson,* 282 Minn. 73, 165 N.W.2d 218 (1968).

   *See also* Clark, Suretyship in the Uniform Commercial Code, 46 Texas L.Rev. 453 (1968); Murray, Secured Transactions—Defenses of Impairment and Improper Care of Collateral, 79 Com.L.J. 265 (1974); Note, Discharge of Sureties—Impairment of the right of Recourse, 9 B.C.Ind. & Comm.L.Rev. 970 (1968).

either insure or notify one in the position of Friendly Ford of insurance lapse or termination.[6] In each of these cases the secured creditor had in fact been notified by the insurance carrier the policy of insurance was about to expire or be cancelled and the secured creditor failed to notify the assignor or procure other insurance. The known insolvency of the debtor was present in two of the cases.[7] The cases do not reflect an assignment clause such as in the case at bar. Other cases have refused to imply and cast such an onerous duty on secured creditors.[8] In *Commerce Union Bank v. May*, 503 S.W.2d 112 (Tenn.1973), the court said:

"We do not agree that [Bank's] presumed superiority of experience and knowledge of . . . transactions over defendants' created a legal duty to see that the fire insurance was renewed. To so hold would be to set an unjustifiable precedent, the consequences of which would be unpredictable and chaotic. Nor does the mere possession of the memorandum of the insurance policy upset the equal opportunity of the defendants and [Bank], in the eyes of the law, to know or ascertain the date of policy expiration. . . . Further, the provision in the note whereby the Bank relieved itself of all liability to perform services, send notices or take action of any kind in connection with the management of the security, operates as a complete bar of the right . . . to claim discharge, that claim being based upon an asserted duty to perform said acts." 503 S.W.2d at 118.

We affirm the judgment of the trial court.

All concur.

---

6. *United States v. Fyles*, 253 F.Supp. 386 (D.Vt. 1965); *Evans v. American National Bank and Trust Co. of Chattanooga, Tenn.*, 116 Ga.App. 468, 157 S.E.2d 816 (1967); *Woodruff Motors, Inc. v. Commercial Credit Corp.*, 123 Vt. 404, 190 A.2d 705, and 124 Vt. 37, 196 A.2d 569 (1963); *see also Liberty National Bank and Trust Co. of Savannah v. Interstate Motel Developers, Inc.*, 346 F.Supp. 888 (S.D.Ga.1972).

7. *United States v. Fyles*, *supra*; *Evans v. American National Bank and Trust Co. of Chattanooga, Tenn.*, *supra*.

8. *E. G. Milburn v. People's Building & Loan Association*, 106 Ark. 415, 153 S.W. 605 (1913); *Hassell v. Sterling Federal Savings & Loan Association*, 132 Ill.App.2d 1005, 271 N.E.2d 7 (1971); *Rayborn v. Fort Thomas Building & Loan Association*, 453 S.W.2d 558 (Ky.1970); *Service Finance Corp. v. Brombaugh*, 135 S.W.2d 503 (Tex.Civ.App.1939); 10 *Williston on Contracts* § 1233 (3d ed. 1967).