CENTRAL MICROFILM SERVICE CORPORATION, Appellant,

v.

BASIC/FOUR CORPORATION, a Delaware corporation, Appellee.

CENTRAL MICROFILM SERVICE CORPORATION, Appellee,

v.

BASIC/FOUR CORPORATION, a Delaware corporation, Appellant.

In Re CENTRAL MICROFILM SERVICE CORPORATION, a Missouri corporation, Petitioner.

Nos. 81–1822, 81–1868 and 81–1984.

United States Court of Appeals, Eighth Circuit.

Submitted May 20, 1982.

Decided Sept. 24, 1982.

Rehearing and Rehearing En Banc Denied Oct. 26, 1982.

William I. Rutherford, Lashly, Caruthers, Thies, Rava & Hamel, P.C., St. Louis, Mo., for plaintiff-appellant cross-appellee.

Morton D. Baron, Thomas R. Jayne, Thompson & Mitchell, St. Louis, Mo., Gerald Walpin, Marvin R. Lange, Susan J. Schwartz, Rosenman, Colin, Freund, Lewis & Cohen, New York City, for defendant-appellee cross-appellant.

Before LAY, Chief Judge, HEANEY, Circuit Judge, and BECKER,* Senior District Judge.

HEANEY, Circuit Judge.

In May of 1978, Basic/Four Corporation terminated its dealership agreement with Central Microfilm Service Corporation (CMS) and CMS filed a complaint alleging breach of contract and fraud. The first trial of these claims resulted in a substantial verdict in favor of CMS, which was set aside by the district court. The second trial resulted in a similar though smaller award for CMS, after which the district court ordered CMS to accept a remittitur or proceed to a third trial. CMS now seeks review of both proceedings, and Basic/Four cross-appeals, seeking judgment notwithstanding the verdict. We dismiss the appeal and cross-appeal for lack of jurisdiction, but grant CMS's petition for mandamus and direct that judgment be entered in the full amount of the verdicts returned in the second trial.

A. *Factual Background and Jurisdiction.*

In 1975, CMS and Basic/Four reached a written agreement pursuant to which CMS served as Basic/Four's dealer in the St. Louis market, selling the latter's computer hardware and accompanying software packages to small businesses. Basic/Four's products initially were not well known in that market and early sales (at upwards of $45,000 per package) were very slow. CMS bore the costs of introducing the product, building a client base, developing local software programmers trained on Basic/Four's equipment and generally establishing the product in the St. Louis market. Although sales gradually increased, CMS never reached the point where it turned a profit on its computer dealership.

The dealership agreement included six-month sales quotas and allowed termination in the event such quotas were not attained in any one period. From the outset, CMS performed well below quota. In early 1977, CMS considered getting out of the computer business, but Basic/Four indicated that it wanted CMS to continue as its dealer. From time to time throughout the relationship, Basic/Four would suggest various personnel and other changes at CMS, most of which were adopted. Some of such changes were adopted in early 1978. In May, 1978, however, Basic/Four terminated the dealership for failure to meet quota and opened an in-house branch sales operation.

CMS filed the present breach of contract action, contending, under an estoppel theory, that Basic/Four waived its right to terminate for not meeting quota. CMS also alleged fraud, contending that Basic/Four had, by January of 1977, decided to open a branch operation in St. Louis and fraudulently induced CMS to continue as dealer until that event occurred. On the contract claim, CMS sought to recover the net losses it incurred as a dealer from 1975 through the termination. On the fraud claim, it sought to recover the same type of losses, but only for the period after January, 1977, when the fraud allegedly commenced.

The case proceeded to trial and, in May, 1979, a jury returned a verdict awarding CMS $261,000 on the contract claim, $73,000 in actual damages on the fraud claim and $750,000 in punitive damages on the fraud claim ($1,094,000 total). Sixteen months after the verdict, the district court rejected Basic/Four's motion for judgment notwithstanding the verdict (j.n.o.v.), but granted its alternative request for a new trial. The stated reasons for ordering a new trial[1] were that (1) the jury was erroneously instructed so as to allow an overlap or double recovery on actual damages, and (2) the punitive damage award was excessive.

A second trial was held and CMS again prevailed on its contract and fraud claims, this time recovering $182,000 on the contract count, $78,000 in actual damages on

---

* The Honorable William H. Becker, United States Senior District Judge, Western District of Missouri, sitting by designation.

1. Additional reasons were disclosed during subsequent proceedings but are not material here in light of our holding as to the first new trial order. *See, infra,* at 1213–1214.

the fraud count and $390,000 in punitive damages for the fraud ($650,000 total). Basic/Four again moved for j.n.o.v. or a new trial, contending *inter alia* that certain instructions were erroneous, that Basic/Four was entitled to j.n.o.v. as a matter of law, and that the verdict was excessive. The district court rejected each principal contention raised in Basic/Four's motion. It ruled, however, that CMS's expenditures for software services were not required by the dealership agreement and were not requested by Basic/Four—and hence, losses related to such services were not recoverable. Excluding such losses would reduce the actual damages for fraud by $40,587. Because the jury appeared to have calculated the punitive damage award at five times the actual fraud damages, the court also made a corresponding proportionate reduction in punitive damages, *i.e.,* to five times the reduced figure of actual damages. The court did not, however, enter a reduced judgment. Instead, it ordered a third trial unless CMS accepted a remittitur in accordance with the determination as to software losses.[2]

CMS declined to accept the remittitur and now seeks reversal of that order and reinstatement of judgment on the verdicts returned in either the first or second trial. Basic/Four initially moved to dismiss the appeal for lack of jurisdiction. We denied that motion without prejudice to Basic/Four's right to assert its jurisdictional claim on the appeal. Basic/Four chose not to press the jurisdictional issue and cross-appealed, contending it is entitled to judgment as a matter of law.[3] Both parties have fully briefed and argued the case on the merits. Before we address the merits, a threshold question is whether there is jurisdiction to review the judgments below.

▋ Review by appeal generally follows the entry of final judgment in the district court. Here, however, the court coupled its remittitur with a contingent new trial order. The latter is considered an interlocutory order which is not ordinarily appealable. *See, e.g., Allied Chemical Corporation v. Daiflon, Inc.,* 449 U.S. 33, 34, 101 S.Ct. 188, 189, 66 L.Ed.2d 193 (1980); *Richardson v. Communication Workers of America,* 469 F.2d 333, 334 (8th Cir. 1972). They are immediately appealable, however, in the narrow circumstances in which such orders are entered without authority. *See Peterman v. Chicago, Rock Island & Pacific Ry. Co.,* 493 F.2d 88, 91–92 (8th Cir. 1974). Here, CMS contends the second new trial order was entered without authority because the district court did not comply with the notice requirement under Rule 59.

▋ Under Rule 59, a district court may, within ten days after entry of judgment, order a new trial on its own motion. When a court acts entirely on its own initiative, *i.e.,* when no party has timely moved for a new trial, the ten-day limit is strictly enforced. *Peterman v. Chicago, Rock Island & Pacific Ry. Co., supra,* 493 F.2d at 91–92 (absent a timely new trial motion, there is no authority to order a new trial outside the ten-day period). When a party has timely moved for a new trial but the court orders such relief on a ground not raised in the motion, the court is deemed to have acted on its own initiative. Under Rule 59, however, the court has authority to act outside the ten-day limit in this circumstance, provided it gives the parties notice and an opportunity to be heard and specifies the grounds on which it grants the new trial. *See* Wright & Miller, *Fed. Prac. & Proc.* § 2813.

The unsettled question is the effect of a court's failure to comply with the notice requirement when it grants a new trial on a ground not raised in the motion for such relief. At least one court implicitly has construed the notice requirement to be jurisdictional rather than procedural, such that failure to provide notice renders the order

---

**2.** Under the remittitur, judgment would be for $182,000 on the contract count, $37,413 in actual and $187,065 in punitive damages on the fraud count (totaling $406,478, or a reduction of more than $240,000 from the second jury verdict).

**3.** We do not suggest that the jurisdictional issue was, or could be, abandoned.

immediately reviewable on the merits. *See Harkins v. Ford Motor Company,* 437 F.2d 276, 277 (3d Cir. 1970) (expressly reserving whether, "in every case," this is the effect of a failure to give notice). Commentators, however, have argued that a court's lack of notice under Rule 59 "should not make its action a nullity." Wright & Miller, *supra,* at § 2813, n. 73; *see also* Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (II),* 81 Harv.L.Rev. 591, 604 (1968).

We need not decide whether the notice requirement under Rule 59 is jurisdictional or procedural because, here, the purpose of such requirement was substantially achieved. It is arguably true that the district court's order for a third trial was granted on a ground not clearly raised in Basic/Four's motion and that there was no prior notice given by the court as to the issue relied upon in the court's decision. CMS moved for reconsideration, however, raising the objections which it would have raised if given prior notice. In giving consideration to such objections, the district court's actions comport with the basic purpose of the notice requirement. Accordingly, we decline to adopt a rule which would render new trial orders immediately appealable where the only defect is a technical lack of notice and such defect is cured by a subsequent opportunity to be heard. Because the new trial order is not immediately appealable, we dismiss the present appeal and cross-appeal for lack of jurisdiction.

CMS alternatively petitions for a writ of mandamus. Mandamus review generally is available only in extraordinary circumstances and such review of new trial orders in particular is "rarely" justified. *Allied Chemical Corporation v. Daiflon, Inc., supra,* 449 U.S. at 36, 101 S.Ct. at 191. Because the right to mandamus must be "clear and indisputable," a district court's action generally must be "blatantly wrong" to justify mandamus relief; arguable error within the scope of trial court discretion is not a proper basis for mandamus. *Cf. Id.*

at 35–36, 101 S.Ct. at 190–191; *General Motors Corp. v. Lord,* 488 F.2d 1096, 1100 n. 2 (8th Cir. 1974). Other factors which bear on the appropriateness of mandamus review include the need to correct error which is likely to recur and to provide guidelines for the resolution of novel and important questions. *See Schlagenhauf v. Holder,* 379 U.S. 104, 111–112, 85 S.Ct. 234, 238–239, 13 L.Ed.2d 152 (1964); *La Buy v. Howes Leather Co.,* 352 U.S. 249, 254–255, 258, 77 S.Ct. 309, 312–313, 314, 1 L.Ed.2d 290 (1957); *General Motors Corp. v. Lord, supra,* 488 F.2d at 1099. Perhaps the most fundamental concern is the avoidance of piecemeal litigation and disturbance of the orderly administration of the courts— key policies underlying the final judgment rule. *See Allied Chemical Corporation v. Daiflon, Inc., supra,* 449 U.S. at 36, 101 S.Ct. at 191. Finality is not served, however, by needless relitigation and it is proper to consider whether appellate review is "fundamental to further conduct of the case." *Gillespie v. United States Steel Corporation,* 379 U.S. 148, 152–154, 85 S.Ct. 308, 310–312, 13 L.Ed.2d 199 (1964); *Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc.,* 466 F.2d 179, 187 (8th Cir. 1972).

Consideration of the foregoing factors makes mandamus review in this case not only appropriate but compelling. The conditional order for a third trial was not based on the type of finding which is traditionally deemed a matter of trial court discretion. When a district court finds that a verdict is excessive in relation to actual injuries, or that a jury was confused by erroneous instructions, or prejudiced by erroneously admitted evidence, a new trial based on such findings is not often reversed because the very nature of the finding is a discretionary matter closely tied to the trial court's observation of the proceedings. *See, e.g., General Motors Corp. v. Lord, supra,* 488 F.2d at 110; *Solomon Dehydrating Co. v. Guyton,* 294 F.2d 439, 446–447 (8th Cir.), *cert. denied,* 368 U.S. 929, 82 S.Ct. 365, 7 L.Ed.2d 192 (1961). Here, however, the district court found that the jury was properly instructed, that the punitive damage award

was not excessive and that the evidence supported the verdict as a whole. The sole ground for ordering a third trial was the inclusion of software losses in the award for actual damages. The court did not find that such losses were improperly measured —indeed, the evidence showed, the jury found and the court accepted that these losses totaled a sum certain of $40,587.00. It ruled, rather, that the software services were not recoverable because they were "required neither by the Agreement nor at the request of defendant." This is a discrete question of law and fact, the resolution of which is clear on the record and does not turn on a trial court's proximity to the proceedings.

Mandamus review in this case, moreover, will facilitate the purposes of the final judgment rule. The matter has twice been tried to a jury and the evidence was substantially the same at both trials. Twice the plaintiff has prevailed on its contract and fraud claims, obtaining substantial awards of actual and punitive damages. The only outstanding issues are CMS's contention that its software losses were properly recoverable and Basic/Four's claims that it was entitled to j.n.o.v. as a matter of law, that the punitive damage award was excessive and that the jury was given erroneous instructions. Each of these issues has been squarely decided by the district court and a third trial would resolve nothing which has not already been resolved by the district court or the jury. Appellate review is thus "fundamental to further conduct of the case." Absent review, a third trial would present the type of needless relitigation which is antithetical to the final judgment rule. Moreover, in light of the district court's post-trial rulings, a third trial would be conducted with virtually the same instructions and evidence as at the second trial, so if the parties' assertions of error are valid, a fourth trial could well be necessary. An important issue is also presented on which guidance for future cases is appropriate: whether generally a new trial rather than a reduced judgment should be ordered when the only alleged defect involves a discrete question of law and fact relating to a sum certain in damages.

In light of all the foregoing considerations, we find that mandamus review is both appropriate and necessary.

### B. *The First Trial.*

Issues arising out of the first trial do not require extensive discussion. In setting aside the results of that trial, the district court found that the jury was wrongly instructed so as to allow a double recovery on the contract and fraud claims. This arose because on the contract claim, recovery was had for all losses incurred between 1975 and the 1978 termination; while on the fraud claim, recovery was had for the same type of losses incurred during a subset of the contract period (*i.e.,* after the fraud allegedly commenced in January, 1977). The result was a $73,000 overlap which CMS concedes it was not entitled to recover. *See Greenwood Ranches, Inc. v. Skie Construction Co., Inc.,* 629 F.2d 518, 521 (8th Cir. 1980).

The district court set forth other grounds for a new trial but we need not review them because the double recovery problem was sufficient to warrant the grant of a new trial.[4] It is true, as CMS suggests, the court might have simply reduced the award of actual damages by the amount of the overlap. It is fairly arguable, however, that the double recovery confused the jury so as to affect the figure for punitive damages as well. Under these circumstances, we cannot say it was an abuse of discretion to correct the conceded error

---

4. The court also ruled that the $750,000 punitive damage award was unduly excessive, in part because it was greater than the amount prayed for in the complaint. We note that an award is not excessive merely because it exceeds the amount stated in the prayer for relief. *See, e.g., Troutman v. Modlin,* 353 F.2d 382,

384–385 (8th Cir. 1965). The court also found the punitive award to be disproportionate to the actual injury inflicted, constituting an abuse of discretion on the part of the jury—a determination which we need not review in light of our holding.

by ordering a new trial rather than by reducing the amount of damages.[5]

## C. *The Second Trial.*

The verdicts following the second trial were for CMS in the amount of $182,000 on the contract count and, on the fraud count, $78,000 in actual damages and $390,000 in punitive damages. The court ruled that the only defect in these verdicts was inclusion of software losses in the recovery for actual damages on the fraud count. No mention of this issue was made by the district court in the first new trial order nor at any point prior to issuance of the second new trial order.

At both trials, CMS sought to establish as damages the net losses it incurred from dealership operations. The basic proof of such losses was offered by CMS's chief accountant, who presented detailed figures as to sales revenue, direct costs and overhead allocations. Basic/Four disputed much of this evidence, arguing, for example, that too much overhead was allocated to the computer dealership operations, that various marketing and personnel recruiting expenses reflected bad judgment or unnecessary expenditures, and that software services were generally mismanaged. The particular claim as to software services was that more effective use of independent software vendors would have been less costly than the in-house programmers developed by CMS. The record includes correspondence and testimony showing that Basic/Four initially recommended hiring in-house programming staff and at later points urged greater reliance on independent vendors. CMS had to provide software services, but how to do so was within its discretion. As with the other disputed items, the reasonableness of specific soft-

ware expenditures is a fact question for the jury. We note that the actual damages awarded in the two trials were remarkably similar—$261,000 in the first trial and $260,000 in the second.[6] The district court analyzed most of the disputed items in terms of the reasonableness of the jury's award and the sufficiency of the evidence. On every item examined in this manner, the court affirmed the jury's determination.

 The court did deny recovery, however, for one item. It ruled that CMS's substantial investment in software services "was required neither by the Agreement nor at the request of defendant. Accordingly, the Court finds that the jury award in Count V improperly included $40,587.00 in losses for computer software services." This determination is clearly wrong.

The dealership agreement expressly required CMS to provide "adequate software programming to meet the requirements of purchasers." In addition, the summary of the dealership program which Basic/Four distributed prior to reaching the agreement, and the course of dealings between these parties thereafter, leave no doubt that CMS alone had the duty, if it was to serve as a dealer, to obtain and provide software services which would adapt the basic systems to the particular needs of customers.

Basic/Four concedes this much, as it must. It attempts to construe the court's ruling to be a determination that CMS was grossly inefficient in handling software services, as Basic/Four had argued at trial. There was indeed a factual dispute at trial as to independent versus in-house software services, which the jury resolved against Basic/Four.[7] If, as Basic/Four argues, the district court sought to set aside the jury's determination by substituting its view as to

---

**5.** Compare the second new trial order, *infra,* at note 8.

**6.** In the first trial, total actual damages are **reflected in the contract count, which then** overlapped with the recovery on the fraud count, *see, supra,* at 1213–1214. In the second trial, the jury was instructed to reduce the contract count recovery by the amount of any actual damages awarded on the fraud

count, to avoid double recovery. Thus, the total awarded at the second trial is the sum of actual damages on the contract and fraud counts.

**7.** Because the jury awarded virtually all amounts requested as actual damages, we must assume they rejected Basic/Four's arguments for arriving at a smaller figure.

a lower figure for software services, CMS might with good cause argue that such an action unreasonably invades the province of the jury. But the court did not purport to do so. It did not deem some software expenditures reasonable and others unreasonable, nor did it make a partial reduction in the award for such items. The court expressly tallied all software revenues during the period of the fraud, subtracted all software costs and denied all recovery for the difference—expressly ruling that it did so because the software expenditures were not required under the agreement. The court's action is thus clear, as is the error on which it rests.

The court also ruled that the second verdict award of $390,000 in punitive damages was based on sufficient evidence and was not excessive. It directed a reduction in this award only to correspond to the mistaken reduction in actual damages. The reasoning was that because the jury awarded punitive damages at five times the actual fraud damages, and because the actual damages were reduced to exclude software losses, a proper punitive award should be only five times the reduced amount of actual damages. *See Ogilvie v. Fotomat Corp.,* 641 F.2d 581, 585 (8th Cir. 1981). We need not decide whether such corresponding reductions are always necessary or appropriate, because here, there is no basis for the reduction once the error is corrected as to the software losses.

Apart from the software exclusion, the district court's rulings fully upheld the punitive and actual damages. The district court rejected every claim advanced by Basic/Four as to instructions, the weight of the evidence, the need for a new trial and the asserted right to j.n.o.v.[8] Thus, once

the software error is corrected, CMS is entitled to judgment in the full amount awarded at the second trial ($650,000), and a writ of mandamus should issue in accord therewith. Such a writ would not be proper, however, if Basic/Four's claims of error are valid. In other words, the order for a third trial would not constitute an abuse of discretion if there were prejudicial errors as alleged by Basic/Four. Accordingly, we turn to the claims raised by Basic/Four.

The principal contention of Basic/Four is that it was entitled to j.n.o.v. as a matter of law on both the contract and fraud counts. The district court carefully considered and rejected these claims, properly emphasizing that one "must view the evidence in the light most favorable to sustaining the jury's findings and must give the prevailing party the benefit of every reasonable inference which may be drawn from the evidence." *Davis v. Burlington Northern,* 541 F.2d 182, 186 (8th Cir.), *cert. denied,* 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 613 (1976). We agree that Basic/Four is not entitled to j.n.o.v.

As to the contract count, Basic/Four contends that an estoppel was not established because (1) Basic/Four did not engage in conduct inconsistent with exercising its right of termination, (2) any estoppel was effectively revoked by certain reassertions of the right to terminate for failure to meet quota, and (3) there was insufficient evidence of reliance or injury.

With respect to the reliance and injury issues, we agree with the district court that there was sufficient evidence to create a jury question. The more arguable claim is, essentially, that Basic/Four encouraged CMS to do only what it was required to do as a dealer,[9] and that it expressly reserved

---

**8.** Thus, unlike the first new trial order, the second order reflects a full and final determination by the district court of every factual and legal claim raised by the parties. The sole alleged defect involved a discrete issue which no one contends confused the jury or otherwise affected the verdict or any of the proceedings. Under these circumstances, particularly where a case has twice been tried to a jury, we think the better practice is to order a reduction in

judgment rather than a new trial. Of course, where other factors warrant a new trial, such relief may be ordered. Here, however, in view of the district court's post-trial rulings, a third trial constitutes clearly useless relitigation and it was an abuse of discretion to order it.

**9.** This is the core reasoning behind the claim that Basic/Four's conduct was not inconsistent with its right to terminate for failure to meet quota.

the right to terminate on quota grounds, such that it cannot be estopped to terminate on grounds of the sales quota. There is evidence to support this theory of the case, but there is more than sufficient evidence to support the jury's verdict.

Briefly, the evidence shows that Basic/Four repeatedly declined to terminate for failure to meet quota; that it was actively involved in CMS's operations throughout the period; and, indeed, that just months before termination, Basic/Four urged CMS to hire new sales staff and remodel its facilities. CMS adopted most of these changes and could reasonably view Basic/Four's urgings as evincing an intent to continue the dealership notwithstanding that sales had been and remained below quota. A jury certainly could find that CMS adopted many of Basic/Four's suggestions in reliance on non-termination under the quota clause. It is also important that in early 1977, following a sustained period of low sales and failure to meet a probationary quota, Basic/Four met with CMS, declined to terminate and expressly stated that it wanted CMS to continue as dealer. Thus, a jury could find that CMS reasonably believed it would be continued as dealer if it continued in good faith to promote Basic/Four's products.

■ The few specific reservations of a right to terminate for failure to meet quota constitute only one factor to be weighed against the other evidence of estoppel—Basic/Four's repeated non-termination when sales were worse, its expressions of a desire to continue CMS as dealer and its affirmative conduct which by its nature evinces a determination to continue CMS as dealer notwithstanding the sales quota. In short, we agree with the district court that it was for the jury to decide whether there was a breach of contract by estoppel.

As to the fraud count, Basic/Four contends it is entitled to j.n.o.v. on numerous grounds, all of which rest on fundamental mischaracterizations of CMS's fraud theory. The fraud allegedly commenced in January, 1977, when Basic/Four met with CMS following failure to meet a probationary sales quota. Basic/Four expressly represented that, notwithstanding such failure, it wanted CMS to continue as its dealer. Basic/Four characterizes this representation as an isolated representation which, even if fraudulent when made, effectively expired in the face of subsequent events, *e.g.*, when the next quota period arose, when the initial three-year term of the contract expired, or when Basic/Four made subsequent reassertions of a right to terminate on quota grounds. It also argues that there could be no reliance and the representation could not be material nor be the proximate cause of injury, because whatever conduct was induced on the part of CMS was, in any event, required performance under the dealership contract.

CMS, however, characterizes the January, 1977, meeting as a "cross-roads" session, coming after failure to meet what Basic/Four had established in the way of a probationary quota. Up to this point, CMS had lost over $180,000 on the dealership and at least one senior CMS officer was considering getting out of the dealership rather than attempt to recoup such losses by investing more funds. One alternative, of course, was to invest more and salvage the dealership through a longer-term turnaround. It appears that at least some CMS officials expected Basic/Four to announce its desire to terminate in the face of continuing difficulties and quota non-attainment. Basic/Four opened the meeting by announcing its desire, notwithstanding the sales problems, to have CMS continue as its dealer. Over the following sixteen months, Basic/Four encouraged CMS's efforts and urged specific personnel and marketing changes, most of which were adopted, and sales gradually improved.

■ In CMS's view, the January meeting and subsequent urgings reflected a mutual commitment to a good faith, longer-term turnaround of the dealership. The fraud allegation is that as of the January, 1977, meeting, Basic/Four had decided to turn the St. Louis market into a branch sales operation and that Basic/Four deliberately and falsely induced CMS to continue

as dealer until such operation was ready to be established. Although the timing and certainty of Basic/Four's plans were disputed, there is substantial evidence on which a jury could find such a fraudulent scheme: an unsuccessful search, prior to the January meeting, to find a replacement for CMS; a senior-level determination to locate branch offices in several metropolitan markets, including St. Louis; a search for a branch manager in mid-1977 which Basic/Four later called premature and arguably disavowed; evidence of discussions within Basic/Four regarding a willingness to increase the quota if necessary to justify termination once the branch operation was ready to be implemented; and just months before the termination, Basic/Four's specific urgings to CMS to fire certain personnel and hire new sales staff, actions which were adopted and which by their nature take time to yield results. In short, a jury could reasonably find that Basic/Four's course of conduct throughout the period from January, 1977, through the termination was calculated to induce CMS to continue as dealer and that such conduct was fraudulent from at least January onward. In other words, a jury could find that Basic/Four induced CMS to continue to absorb the start-up costs of introducing the products (in expectation of a longer-term turnaround) while Basic/Four intended to terminate CMS and establish an in-house operation.

There simply is no merit to Basic/Four's claims that a finding of materiality, reliance and proximate cause is precluded because CMS merely performed as it was required to perform under the dealership contract. As of January, 1977, CMS had lost over $180,000 and had an arguable legal right to get out of the dealership at that point. *See, e.g., Feld v. Henry S. Levy & Sons, Inc.,* 37 N.Y.2d 466, 373 N.Y.S.2d 102, 335 N.E.2d 320 (1975); *Bloor v. Falstaff Brewing Corp.,* 601 F.2d 609, 612–613, n. 7 (2d Cir. 1979). If CMS knew that Basic/Four intended to install a branch operation in St. Louis, CMS almost certainly would have sought to terminate. We need not and do not hold that CMS had an indisputable right to terminate on these grounds, but there certainly is more than a colorable basis for doing so. The jury, thus, could find that the entire sixteen-month continuation would not have occurred but for the fraudulent misrepresentations.[10]

We recognize that a jury might have found that some of the parties' conduct between January, 1977, and the termination effectively put CMS on notice as to Basic/Four's intentions or otherwise made reliance unreasonable in whole or in part. The evidence is mixed, however, and we cannot say it is so one-sided that it compels a judgment for Basic/Four as a matter of law. These issues have been vigorously litigated and twice submitted to juries which on both occasions found Basic/Four liable for fraud and awarded very similar amounts in actual damages—$73,000 in the first trial and $78,000 in the second. Such determinations will not lightly be set aside, especially upon appellate review.

Basic/Four also contends that the jury instructions with respect to liability were erroneous and prejudicial. We disagree. The district court followed Missouri Approved Instructions (MAI). *See Scott v.*

---

**10.** There is no merit to the contention that because the initial three-year period of the dealership expired, a new contract was formed which somehow cut off the fraud claim as a matter of law. The contract renewed automatically absent notice to the contrary. Thus, it operated as an extension of the agreement and not formation of a wholly new contract and, in any event, Basic/Four never sought to terminate under the renewal clause. Nor does the "risk" of nonrenewal defeat, as a matter of law, the claim that CMS relied upon fraudulent inducements to continue the relationship. Here, CMS contends that Basic/Four waived its right to terminate on quota grounds and falsely induced CMS to believe that the relationship would continue in good faith in an attempt to establish a successful dealership. If, as the jury found, CMS believed and relied in this manner, it is at least reasonable to find that CMS also believed Basic/Four would not suddenly terminate under the nonrenewal clause. Moreover, the nonrenewal clause presented a potential opportunity for *either* party to terminate and the exercise or non-exercise of such opportunity is simply another factor for the jury to consider in determining the reasonableness of reliance.

*Conroy*, 577 F.2d 13, 16 n. 2 (8th Cir. 1978). As the court noted, the principal purpose in doing so was to simplify the framework of issues for the jury and allow the parties to more fully set forth their respective positions within such framework. As to the estoppel claim, the instructions directed the jury to decide the factual disputes which were critical to recovery, *e.g.*, whether Basic/Four engaged in certain conduct and made certain representations, as alleged; whether such conduct induced CMS reasonably to believe that the contract would not be terminated on quota grounds; and whether CMS relied on Basic/Four's statements and acts and, in so doing, used ordinary care.

■■■■ The foregoing instructions adequately presented the estoppel issue as it has been formulated under Missouri law. Missouri courts have held that "the substance of estoppel is the *inducement* of another to act to his prejudice." *White v. Smith*, 440 S.W.2d 497, 504 (Mo. App. 1969) (emphasis in original, citations omitted). This issue was squarely submitted. The Missouri cases consistently construe an estoppel claim to have three elements: (1) an act or statement inconsistent with the right later asserted; (2) reliance on such act or statement; and (3) injury. *See, e.g., Chrysler Credit Corp. v. Friendly Ford, Inc.*, 535 S.W.2d 110, 112 (Mo. App. 1976) (citations omitted). Here, the issues of reliance, injury and the basic facts giving rise to the estoppel were expressly submitted under the instructions. The court did not expressly instruct as to the nature of the inconsistency element, but we find no prejudice in this respect. The nature of the inconsistency was self-evident and fully litigated by the parties: Were Basic/Four's conduct and statements consistent with its actions under the termination clause or did such conduct

waive its rights under that clause? To state the issue is to state the inconsistency. Moreover, a finding of inconsistency was a necessary, albeit implicit, element of the instructions. For the jury to find for CMS, it specifically had to find that Basic/Four's conduct induced CMS to reasonably believe it would not be terminated under the quota clause. Such a finding necessarily implies that Basic/Four's conduct was not consistent with terminating CMS under that clause. Under these circumstances, the failure to expressly instruct as to inconsistency did not prejudice Basic/Four and is not reversible error. *Cf. Hinkeldey ' v. Cities Service Oil Co.*, 470 S.W.2d 494, 502 (Mo. 1971) (not every controverted element need be instructed upon when it is established as a matter of law).[11]

Basic/Four also asserts it was error not to instruct that the estoppel-creating conduct must be "absolute and unequivocal;" that opinions and inferences are insufficient to establish estoppel; and that conduct susceptible of two constructions, one of which is consistent with the right sought to be estopped, does not form an estoppel. There is some support in Missouri case law for consideration of these factors. *See Peerless Supply Co. v. Industrial Plumbing & Heating Co.*, 460 S.W.2d 651, 667 (Mo. 1970). The court, in its discretion, might well have instructed the jury that in determining inducement and reliance, it should consider such factors.[12] The only elements consistently held to be necessary to an estoppel claim, however, relate to the estoppel-creating facts, inducement and reliance, elements on which the court did instruct the jury. *See id.* at 666; *Chrysler Credit Corp. v. Friendly Ford, Inc., supra*, 535 S.W.2d at 112; *White v. Smith*, 440 S.W.2d 497, 503–504 (Mo. App. 1969). We cannot say that

---

11. We do not suggest that an estoppel was established as a matter of law. The nature of the inconsistent acts, however, was factually established such that the only issue was the effect of such acts in terms of inducement and reliance.

12. Basic/Four did not submit simple, neutral instructions in this regard. It submitted argu-

mentative instructions which required unjustified commentary on the evidence and which all but directed a verdict in favor of Basic/Four. The district court was well within its discretion in rejecting such submissions. *See, e.g., Barnes v. Marshall*, 467 S.W.2d 70, 78–79 (Mo. 1971) ("instructions shall be simple, brief, impartial, free from argument").

the district court omitted elements that are clearly required under Missouri law, nor that, read as a whole, the instructions misled or confused the jury or otherwise failed to present the issues necessary to their verdict.

As to the fraud claim, the court instructed that to find for CMS, the jury must find (a) that Basic/Four represented to CMS that it would continue as dealer, intending CMS to rely thereon; (b) that such representation was false and Basic/Four knew it was false when made; (c) that the representation was material to CMS in making expenditures for the selling of Basic/Four's products; (d) that CMS relied on such representation and, in so doing, used ordinary care; and (e) that CMS was injured as a direct result of such representation. This instruction plainly covers the elements that are essential to a fraud claim under Missouri law and that were in dispute here. *See, e.g., Walsh v. Ingersoll Rand Co.,* 656 F.2d 367, 369 (8th Cir. 1981); *Slater v. KFC Corp.,* 621 F.2d 932 (8th Cir. 1980).

Basic/Four contends it was reversible error not to instruct that an additional required element was CMS's lack of knowledge as to the falsity of Basic/Four's representation. The "hearer's ignorance of falsity" is an element of fraud. *See, e.g., Slater v. KFC Corp., supra,* 621 F.2d at 936. Here, however, that issue was not in dispute. No one contends that as of the January, 1977, meeting (at which Basic/Four represented that it wanted CMS to continue as dealer) CMS had knowledge of Basic/Four's plan to establish a branch operation or otherwise knew that the representation at that meeting was false. Basic/Four's claim as to CMS's knowledge actually relates to reliance, *i.e.,* that the subsequent conduct at some point put CMS on notice as to Basic/Four's true intentions or, at least as to the possibility Basic/Four would terminate on quota grounds. Because there was no claim that CMS had knowledge of falsity at the time of the representation, we cannot find that omitting an instruction on that element was prejudicial to Basic/Four. *See Gottlieb v.*

*Hyken,* 448 S.W.2d 617, 620 (Mo. 1970) (facts not in dispute need not be included in instructions).

Basic/Four also complains that the fraud instructions did not define "reliance" and did not address a number of factors which weigh against a finding of reasonable reliance, *e.g.,* that written assertions of a right to terminate on quota grounds may outweigh contrary oral representations; that the possibility of nonrenewal under the contract may affect the extent of reliance which would be deemed reasonable; and that a representation is not the proximate cause of injury if the injuries would have occurred regardless of the representation. These factors are not essential legal elements of a fraud claim but rather are evidentiary factors bearing on the reasonableness of reliance. The significance of these factors was fully argued to the jury by the parties. In our view, had Basic/Four requested a simple, neutral instruction directing the jury to consider such factors, the district court should have given such an instruction. Basic/Four did not do so, however. It submitted an extensive list of highly argumentative instructions which effectively required unjustified commentary on the evidence and which were virtually verdict-directing in their character. It was well within the district court's discretion to reject such submissions. *See, e.g., Barnes v. Marshall,* 467 S.W.2d 70, 78–79 (Mo. 1971); *Gottlieb v. Hyken,* 448 S.W.2d 617, 620 (Mo. 1970); *Wright v. Farmers Co-Op of Arkansas and Oklahoma,* 620 F.2d 694, 696–697 (8th Cir. 1980) (in diversity, state law controls the substance of jury instructions, but the grant or denial of an instruction is a procedural matter for determination under federal law).

In sum, as to both the fraud and contract claims, the district court properly submitted to the jury—in simple, neutral terms—all of the ultimate factual issues which were necessary to the jury's determination of CMS's claims under Missouri law. The parties, in developing the evidence and in presenting closing arguments, clearly presented their positions on how the details of their dealings bear on the question of estoppel, fraud and, in particular, on the reasonableness of

reliance. Twice juries have found for CMS on both claims. We cannot say that such findings are against the weight of the evidence, wrong as a matter of law, or attributable to erroneous instructions on the controlling legal principles. The instructions were consistent with MAI practice and there is no showing that the jury was misled or confused. Accordingly, we cannot say the district court erred in upholding the jury's finding of liability.

■ The only remaining issue is damages. The district court ruled that the benefit-of-the-bargain rule of damages is controlling, but the theory actually pursued was a reliance or out-of-pocket loss theory. In reviewing the damage award, we look to the evidence actually adduced, the instructions actually given and the award actually made—not to labels or rationalizations offered outside the trial itself.

Both parties litigated damages on an out-of-pocket loss theory. CMS introduced no evidence of future profits and sought no recovery on such a basis. It introduced evidence detailing its specific costs and overhead allocations as well as its revenue from sales of hardware and software services. Basic/Four's evidence essentially consisted of disputing whether certain expenditures were sound, whether certain overhead was properly allocable to the dealership and, more generally, whether CMS's losses were due to its own ineptness and failures rather than to reasonable business practices. The jury instructions were very simple: on the contract count, the jury was directed to award "such sum as you believe will fairly and justly compensate plaintiff for any damage you believe plaintiff sustained as a direct result of such breach of contract;" and as to fraud, to award "all amounts as shown by the evidence which are the direct and actual consequence of plaintiff having acted on the truth of such representation." See Jurcich v. General Motors Corp., 539 S.W.2d 595, 601 (Mo. App. 1976). These general directions, in tandem with the parties' development of the case, make clear that the damages were to be measured on an out-of-pocket loss basis. Moreover, because the jury awarded as actual damages almost precisely the net loss figures proffered by CMS, it is also clear that the jury rejected Basic/Four's contentions.

■ Most of Basic/Four's assertions relating to damages are an attempt to relitigate fact questions which the jury resolved against it. The district court found no compelling reason to set aside those determinations; nor do we. Apart from such matters, Basic/Four contends that the district court should have given more specific guidance to the jury in measuring damages. Missouri law, however, expressly permits the use of the generalized instruction given in this case when, as here, the parties have clearly presented the nature of the dispute as to damages. See, e.g., Boten v. Brecklein, 452 S.W.2d 86, 93 (Mo. 1970). On this record, there is no doubt that if out-of-pocket losses are a proper theory of recovery, then damages were properly submitted and the award made was a reasonable one.

■ Basic/Four contends that the award should be set aside because it does not reflect the traditional benefit-of-the-bargain measure which is the general rule in Missouri. See, e.g., Slater v. KFC Corp., supra; Smith v. Tracy, 372 S.W.2d 925, 938 (Mo. 1963). Missouri courts, however, have permitted alternative measures of damages when the "bargain theory" measure, "because of the peculiar circumstances of the case involved," would not accurately measure the loss sustained. Schroeder v. Zykan, 255 S.W.2d 105, 110 (Mo. App. 1953); see also Hough v. Jay-Dee Realty and Investment, Inc., 401 S.W.2d 545 (Mo. App. 1966); Security Stove & Mfg. Co. v. American Ry. Express Co., 227 Mo.App. 175, 51 S.W.2d 572, 573, 576 (1932). In our view, the present case is just such a "peculiar" one in which the out-of-pocket loss theory is appropriate.

■ As to fraud in a transaction, the typical "bargain theory" measure is the difference between the actual value and the represented value of the subject of the transaction. See Smith v. Tracy, supra, 372 S.W.2d at 938. Such a measure simply makes no sense in this case, given the nature of the fraud. Basic/Four did not make representations as to specific values or as to

particular facts directly relating to such values. It fraudulently induced CMS to continue as a dealer and the harm from such continuation is best measured by the net losses incurred as result of it.

The contract count is a quite different theory. The essence of that claim is wrongful termination—that quite apart from the fraudulent inducement to continue, CMS did continue and was wrongfully prevented from reaching the recoupment or turnaround point. In effect, the claim is that Basic/Four appropriated the benefit of CMS's efforts to introduce the product, leaving CMS to incur the start-up costs without the longer term return. Lost profits might ordinarily be the proper measure for recovery but, here, the dealership had only operated for a few years, had yet to reach the break-even point and profit margins were not susceptible to precise measurement. Although a lost-profits theory might often result in a larger recovery than under the out-of-pocket theory, here, lost profits might well be speculative. The more certain measure which comes closest to putting CMS where it would have been but for the breach is the out-of-pocket loss theory. *See Restatement of Contracts* (First) § 333, comment (b). Thus, in our view, the damage award was based on a proper theory.

As to punitive damages, Basic/Four disputes the adequacy of the instructions and the propriety of the $390,000 award. Neither contention is persuasive.

 The court instructed that if the jury found for CMS on the fraud claim, then it "may" award punitive damages if the fraud was "wilful, wanton or malicious." The instructions also defined "malice" as the "doing of a wrongful act intentionally without just cause or excuse." The court also admonished the jury, in a more general instruction, not to let passion, prejudice or sympathy enter into their deliberations. This instruction expresses the proper standard under Missouri law. *See, e.g., Beggs v. Universal CIT Corporation,* 409 S.W.2d 719, 722 (Mo. 1966).

 There is no merit to the claim that by using the disjunctive "or" between the terms "wilful, wanton or malicious," the jury was instructed to award punitive damages simply upon finding that Basic/Four's misrepresentations were made knowingly. The instruction must be read as a whole and doing so leaves no doubt that the jury was instructed that it must find legal malice before awarding punitive damages. *Cf. Wright v. Farmers Co-Op of Arkansas and Oklahoma, supra,* 620 F.2d at 697 (reviewing court must read and consider the charge as a whole and a single error may be cured by consideration of the entire charge).

Nor was Basic/Four entitled to an instruction that a good faith exercise of a contract right cannot give rise to punitive damages. This proposition has support in the abstract under Missouri law. *See Pollock v. Brown,* 569 S.W.2d 724 (Mo. 1978). The fraud issue here, however, focuses on the inducement, in January, 1977, and thereafter, of continued efforts by CMS when Basic/Four had already decided to establish branch operations in St. Louis. Whether the fraud at that time was intentional and without just cause is the key inquiry, not Basic/Four's state of mind as of the termination. If the jury believed CMS's theory that Basic/Four had made the branch operation decision by January, 1977, the false inducement to continue and subsequent termination when the branch was set up could not have been in good faith.

 Finally, Basic/Four was not entitled to an instruction that punitive damages are disfavored in the law. This may be true and it may affect a court's assessment of the reasonableness of a punitive award, but Basic/Four points to no Missouri rule or case requiring instruction on the point. Moreover, as we have noted, "[u]nder Missouri law, the question of whether or not punitive damages shall be awarded and, if so, in what amount, rests peculiarly in the discretion of the jury." *Northern v. McGraw-Edison Co.,* 542 F.2d 1336, 1349–1350 (8th Cir. 1976) (citations omitted). Here, the district court found that the punitive award was not excessive and was justified by the evidence. We agree. Two juries have rendered verdicts

in this case, the first awarding $750,000 in punitive damages and the second, $390,000 in such damages. Basic/Four has failed to show why the latter verdict is so unreasonable or grossly disproportionate to the actual injuries that it must be set aside.

Thus, we find no merit to Basic/Four's claims of error in connection with the second trial and, accordingly, a third trial would not be warranted on the basis of such contentions. The only error was the partial reduction in the verdicts returned in that trial. CMS's petition for mandamus is therefore granted and the district court is directed to enter judgment in favor of CMS in the full amount of the verdicts returned in the second trial.